IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| STEVEN LAWRENCE GOELLING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 7:09cv00225 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) By: Michael F. Urbanski |
| Commissioner of Social Security, | ) United States Magistrate Judge |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Steven Lawrence Goelling ("Goelling") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the "Act"). Goelling raises three primary issues on appeal. First, he contends that the Administrative Law Judge ("ALJ") erred in determining Goelling did not meet the requirements of Listing 12.05. Second, Goelling asserts that this case should be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for consideration of evidence submitted to the Appeals Council that relates to his traumatic brain injury. Third, Goelling argues that the ALJ relied on inconsistent and unclear testimony from the vocational expert ("VE") in determining he can perform jobs that exist in significant numbers in the national economy.

After carefully reviewing the record, the court finds no merit in plaintiff's first argument, as Goelling has not met the threshold requirement set forth in Listing 12.05. However, there is a reasonable possibility that the records submitted to the Appeals Council concerning Goelling's diagnosis of a traumatic brain injury could have changed the outcome of the ALJ's decision, and therefore remand is warranted under Wilkins v. Secretary, Department of Health & Human

Services, 953 F.2d 93, 96 (4th Cir. 1991) (en banc). Additionally, the VE's testimony in this case, on which the ALJ relies at step 5 of the sequential evaluation process, is inconsistent and troubling. For these reasons, the court is constrained to find that this case should be remanded to the Commissioner for further consideration. As such, defendant's Motion for Summary Judgment (Dkt. #19) is **DENIED**.

I

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996).

2

Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education,

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

3

work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II

Goelling was thirty-four years old at the time of the ALJ's decision (Administrative Record, hereinafter "R." 80), and is considered a "younger individual" under the Act. 20 C.F.R. §§ 404.1563(b), 416.963(b). He completed the eleventh grade (R. 75) and previously worked as a drain layer, general laborer and quilting machine operator. (R. 80, 128, 373.) Goelling filed an application for benefits on August 24, 2004 alleging disability onset as of December 19, 2000.[2] (R. 74, 109, 112, 134.) His date last insured is December 31, 2006. (R. 112, 134.) Goelling's application for benefits was rejected by the Commissioner initially and again upon reconsideration. An administrative hearing was held on April 4, 2007. (R. 363-407.)

In an opinion issued on May 11, 2007, the ALJ found that Goelling's burst fracture of the T9 vertebra with residuals of surgery, adjustment disorder with depression and anxiety, pain disorder with psychological factors and general medical condition, borderline intellectual functioning, and personality disorder featuring polysubstance abuse, all qualify as severe impairments, pursuant to 20 C.F.R. §§ 404.1520(c), 416.920(c). (R. 82.) The ALJ found no substantial evidence of other impairments which significantly limit Goelling's ability to work, and specifically noted that his "allegations of a brain injury are not supported by the objective

---

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. §§ 404.1529(a), 416.929(a).

[2] Although the ALJ states in his decision that the onset date is August 24, 2004 (R. 74), Goelling lists his onset date as December 19, 2000 in his application and related materials. (See R. 109, 112, 134.)

4

medical evidence of record and cannot be accepted." (R. 77.) The ALJ determined that Goelling has the RFC to perform sedentary work with additional limitations, including no more than simple repetitive tasks; no complex instructions; no sustained concentration longer than fifteen minutes on a single task; only occasional contact (incidental to task, not essential) with co-workers, supervisors and the general public; can work alone but not in isolation; a fairly static work setting, without only occasional changes in work setting and routine; a sit/stand option; no driving as a job duty; no climbing ladders, ropes or scaffolds; occasional kneeling, crawling, crouching, climbing, and balancing; and no exposure to hazards. (R. 78.) Finding there are a significant number of jobs in the national economy that he can perform, the ALJ held that Goelling is not disabled under the Act. (R. 83.) Goelling submitted additional medical records to the Appeals Council, but they held that the information did not provide a basis for changing the ALJ's decision. (R. 6.) Thus, the Appeals Council denied Goelling's request for review and this appeal followed. (R. 5-8.)

## III

Goelling's first argument on appeal is that the ALJ erred in finding he did not meet the requirements for Listing 12.05C.[3] This mental retardation listing provides as follows:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> 
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

---

[3] On brief, Goelling argues generally that he meets the requirements of Listing 12.05 but does not specify a particular subsection. At oral argument, however, the parties focused on whether Goelling satisfies the requirements for Listing 12.05C.

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> . . .

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05. While Goelling's IQ scores[4] fall within the range identified in subsection C, Goelling has failed to prove he meets the requirements of Listing 12.05. Indeed, the court need not even determine whether subsections A, B, C, or D have been satisfied in this case, because Goelling plainly has not met the threshold requirement set forth in the introductory paragraph, as he has not proven that he has deficits in adaptive functioning initially manifested during the developmental period.

The introduction to section 12.00 Mental Disorders, 20 C.F.R. Pt. 404, Subpt. P, App'x 1, states:

> Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria, we will find that your impairment meets the listing.

(Emphasis added.) The Fourth Circuit has held that the requirements outlined in the introductory paragraph of Listing 12.05 are mandatory. Luckey v. U.S. Dep't of Health & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989) ("In dispute are the issues of whether Luckey's low IQ manifested itself in deficits in his adaptive behavior before age 22 and whether he has a physical or mental impairment imposing additional and significant work-related limitation of function."); accord

---

[4] At a consultative examination, Gary Sarver, Ph.D., found that Goelling had a verbal IQ of 66, a performance IQ of 60 and a full scale IQ of 61. (R. 265.) These scores indicate that he is functioning within the mentally retarded range; however, Dr. Sarver noted his lack of effort during the evaluation and suggested he may actually be functioning in the borderline intellectual range. (R. 266.)

Norris v. Astrue, No. 7:07cv184, 2008 WL 4911794, at *2-3 (E.D.N.C. Nov. 14, 2008) (holding the diagnostic description of § 12.05 requires a showing of both low IQ and adaptive functioning deficits); Hatfield v. Astrue, No. 5:07cv267, 2008 WL 4449948, at *6 (S.D. W.Va. Sept. 29, 2008) ("[O]ne of the essential features of mental retardation is significant deficits in adaptive functioning."); Thomas v. Astrue, No. 1:07cv22, 2008 WL 2169015, at *14 (W.D. Va. May 23, 2008) ("[A]longside the two requirements in 12.05C, the introductory paragraph of section 12.05 creates an additional element required to meet the listing for mental retardation....").

According to the plain language of § 12.00 governing mental disorders, Goelling must prove that he has deficits in adaptive functioning initially manifested during the developmental period before moving on to the requirements of § 12.05C or D. See also Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition) 42 [hereinafter DSM-IV] ("Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning."). "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV 42.

The instant record does not reflect significant deficits in Goelling's adaptive functioning before the age of 22. While Dr. Sarver found that Goelling fell within the mentally retarded range of intellectual functioning during his consultative psychological evaluation in February, 2005, there is no indication in Dr. Sarver's report that Goelling has functioned in this range throughout his life, or more specifically, before the age of 22. Indeed, Dr. Sarver's report notes that Goelling's "early school history reveals that his grades and behavior were within normal limits. In high school, he did average academically and he was suspended from school. He was

not retained nor did he fail any grades. He reported no difficulty with reading or writing . . . ." (R. 262.) No other medical evidence in the record gives any indication that Goelling had significant deficits in adaptive functioning before the age of 22. As such, the ALJ's finding that Goelling did not meet the requirements of Listing 12.05 is supported by substantial evidence.

## IV

Goelling's second argument on appeal is that this case should be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for consideration of the evidence submitted to the Appeals Council, which plaintiff argues supports his allegations of a traumatic brain injury. The court agrees.

### A.

Goelling claims disability based on a back and brain injury. (R. 127.) The ALJ failed to consider his allegations of a brain injury, however, because the claims were "not supported by the objective medical evidence of record and cannot be accepted." (R. 77.) The ALJ did not consider the alleged brain injury to be a severe impairment (R. 82), and therefore did not take any resulting limitations stemming from this injury into account in determining that Goelling had the capacity to perform competitive work activity. (R. 79-80.)

In his request for review, Goelling submitted to the Appeals Council 75 pages of records dating back to 1999, some of which document a diagnosis of traumatic brain injury. (See R. 288-362.) Goelling also submitted records from November, 2007 through April, 2009 (see R. 10-13, 16-24, 26-68), which the Appeals Council held did not affect the instant disability determination because they related to a later time period. (R. 6.) This evidence can be summarized as follows.

Goelling was admitted to Grant/Riverside Methodist Hospital on April 7, 1999 after suffering a closed head injury and ninth thoracic vertebral body fracture as a result of a twelve foot fall from a ladder. (R. 306.) A CT of the brain showed increased edema and an intra-axial hemorrhage. (R. 303.) He was discharged one week later in good condition with diagnoses of a traumatic brain injury, T9-10 compression fracture, and T9 transverse process fracture. (R. 305.) He was advised to follow up with the trauma services clinic. (R. 309.) By letter dated June 24, 1999, Dr. Janet Bay of Neurological Associates, Inc. stated that Goelling was making a nice recovery from his head injury but that he remained somewhat impulsive, had difficulty with recent memory, and complained of headaches. (R. 302.) However, he was noted to be functioning well within his home environment. (R. 302.) In a letter to Dr. Mysiw[5] dated August 16, 1999, Dr. Bay noted that Goelling was doing well, had less back pain and spasm, and that Lortab was helping with his headaches. (R. 300.) Dr. Bay released him to work as of August 17, 1999 with a fifty pound weight limit. (R. 301.)

One year after his first fall, in March, 2000, Goelling presented to Dr. Bay for a follow-up on his head injury and compression fracture. (R. 299.) Dr. Bay noted that he was doing fairly well, but had some mid-thoracic back pain with a burning quality. (R. 299.) Goelling did not see Dr. Bay again until the following year, when he returned in March, 2001 after he fell from a ladder a second time and complained of weakness, numbness, and spasticity. (R. 298.) Dr. Bay noted he was "clearly neurologically changed." (R. 298.) He returned three weeks later complaining of increasing difficulty with spasticity and weakness in his legs. (R. 297.) After reviewing the diagnostic studies, Dr. Bay noted he had some chronic cord compression and

---

[5] At the administrative hearing, Goelling testified that he was treated by Dr. Mysiw, "a head doctor," following his brain injury. (R. 394.) There are numerous letters written by Dr. Bay to Dr. Mysiw, but no treatment records from Dr. Mysiw are in the record.

suggested transthoracic resection of the vertebral body with interbody fusion. (R. 297.) Goelling underwent surgery in May, 2001. (R. 310-11.) Following surgery, he participated in rehabilitation program and was noted at a June 7, 2001 appointment with Dr. Bay to be doing very well. (R. 295.) He could walk long distances with a walker, his leg strength was near normal, and he was getting stronger. (R. 295.) On July 30, 2001, he was less tight and spastic, and Dr. Bay told him he only needed to wear his brace when he is up and moving around. (R. 294.) He reported on October 30, 2001 that his legs were much stronger and he was overall improved. (R. 293.) Notes reveal he could walk independently and although he used a cane could walk without one. (R. 293.) His left leg showed normal strength and his right leg had trace weakness. (R. 293.)

On April 2, 2002, nearly one year after surgery, Dr. Bay noted that Goelling's "gait definitely has a spastic flavor to it" and recommended another short course of physical therapy. (R. 292.) Dr. Bay strongly encouraged him to go through a Bureau of Vocational Rehab program, noting while he cannot do heavy labor, "there is no reason why he could not get a job that would involve the use of his hands and brain." (R. 292)

Evidence that post-dates the ALJ's May, 2007 decision documents Goelling's continued complaints of back pain. An x-ray taken in October, 2007 showed multilevel degenerative disc disease most pronounced and moderately advanced at L5-S1. (R. 49.) A CT scan of the thoracic spine in December, 2007, revealed no discernable disc herniation or central canal mass and no adverse features of anterior fusion from T8 to T12. (R. 20.) Records dated December 27, 2007 indicate Goelling was encouraged to explore a brain injury support group at Alleghany Regional Hospital (R. 55), and on January 15, 2008, he was provided information on a monthly support group. (R. 58.)

**B.**

The Appeals Council must consider evidence submitted with a request for review in deciding whether to grant review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991) (en banc). Evidence is considered to be "new" if it is not duplicative or cumulative. Id. at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id. at 96 (citing Borders v. Heckler, 777 F.2d 954, 956 (4th Cir. 1985)). Where, as here, the Appeals Council considered the additional evidence submitted to it, but denied review, the Fourth Circuit requires the district court to "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings." Id. at 96.

Considering the fact that the ALJ expressly declined to consider any allegation of a brain injury, citing a lack of objective evidence to support it, the medical evidence submitted to the Appeals Council documenting a brain injury would be considered "new" under Wilkins.[6] This evidence also meets the third Wilkins requirement, as the records dating from 1999 to 2002 and marked as Exhibits AC-1 and AC-2 relate to the period in question. Additionally, the two records dated December 27, 2007 and January 15, 2008 referencing a brain injury support group

---

[6] Any evidence submitted to the Appeals Council concerning Goelling's back injury, however, is duplicative or cumulative and would not warrant remand in this case. Based on a review of the entire record, the court sees no reason to disturb the ALJ's findings as to Goelling's physical RFC. Evidence indicates his condition improved after surgery, his subsequent treatment was limited and conservative, and at the administrative hearing, he testified he was taking only ibuprofen for pain and was not under a doctor's care. (R. 392.) Additionally, his treating physician, Dr. Bay, stated he could perform work that does not involve heavy lifting less than one year after surgery. (R. 292.)

also relate to the relevant period, as Goelling sustained the head injury in 1999 and could have suffered residual functional limitations.[7] (R. 55, 58.)

The issue of whether this evidence is material, however, presents a closer question. On one hand, Goelling's treating neurosurgeon, Dr. Bay, released him to work twice following his head injury, which suggests that new evidence documenting a brain injury may not have made a difference. On the other hand, the ALJ did not have the benefit of reviewing records that support Goelling's allegations that he suffered a traumatic brain injury after a fall from a twelve foot ladder. The ALJ expressly declined to consider any such allegations, and any functional limitations imposed by this impairment were not taken into account in determining Goelling's RFC. As the ALJ noted, "[t]he residual functional capacity considers only functional limitations and restrictions which result from an individual's medically-determinable impairments." (R. 78.) The ALJ's failure to take into account Goelling's brain injury allegations also impacts the credibility determination.

The testimony elicited at the administrative hearing raises a question as to whether this brain injury left Goelling with any limitations that might have affected the ALJ's RFC determination. In his disability application, Goelling complained of difficulty with his memory and ability to pay attention following his injury (R. 151), and he testified to that effect. Goelling stated that he began having memory trouble after falling from a ladder and hitting his head on concrete in 1999. (R. 393.) He testified that he was treated for his head injury by Dr. Mysiw at Ohio State and noticed difficulty with his memory following his rehabilitation. (R. 394.) Goelling specifically claims that that he does not "remember everything" (R. 383), forgets appointments (R. 384), and receives help from family paying the bills. (R. 393.) Based on

---

[7] The remaining evidence submitted to the Appeals Council dated after the ALJ's May, 2007 decision does not relate to the relevant period and does not provide grounds for remand.

Goelling's testimony at the administrative hearing, the ALJ noted on the record that it was clear he had trouble remembering dates. (R. 383.)

The record contains no treatment records from Dr. Mysiw, nor any evidence directly linking this brain injury with specific functional limitations. However, a few statements in Dr. Bay's treatment records give the court some pause. For example, following his injury in 1999, Dr. Bay noted that Goelling remained impulsive, had difficulty with memory, and complained of headaches. (R. 302.) Likewise, on a vocational rehabilitation form she filled out in 2002, Dr. Bay stated that Goelling was left with impulsivity and difficulty concentrating following his head injury. (R. 188-89.) She listed "mild cognitive impairment – permanent" as a residual limitation. (R. 189.) Additionally, even as late as December, 2007 and January, 2008, Goelling was encouraged to explore a traumatic brain injury support group at the hospital and was provided information on such a support group. (R. 55, 58.)

The results of Dr. Sarver's consultative psychological evaluation are also troubling. Dr. Sarver noted during his examination in February, 2005 that Goelling was marginally cooperative, had a broodingly resentful affect, and appeared sullen and contentious. (R. 264.) Although test results showed he was functioning within the mentally retarded range, Dr. Sarver noted that he was more likely in the borderline intellectual functioning range and was exhibiting poor effort during the evaluation. (R. 266.) Memory and attention were noted to be in the borderline range, and his ability to pay attention to detail was in the mentally retarded range. (R. 265.) Overall, Dr. Sarver determined that his memory function was in the mentally retarded range. (R. 265.) Dr. Sarver tagged Goelling's GAF at 51[8] and found that he is likely to have difficulty controlling

---

[8] The Global Assessment of Functioning, or GAF, scale ranges from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 1994). A GAF

his impulses. (R. 267.) Dr. Sarver noted Goelling "is likely to depend on other people and/or situations to structure life for him," and stated Goelling would be unable to manage benefits should they be awarded. (R. 265-66.)

There is enough in this record for the court to find a reasonable possibility that the evidence submitted to the Appeals Council concerning a traumatic brain injury could have changed the outcome of the ALJ's decision. The ALJ based Goelling's RFC limitations on restrictions that "may be imposed by the claimant's 'severe' impairments." (R. 79.) Because he did not find the brain injury to be a severe impairment, the ALJ did not consider any resulting functional limitations in his disability determination. Given the very nature of a traumatic brain injury, the fact that the ALJ observed Goelling's memory trouble at the administrative hearing, Goelling's testimony as to his limitations, the medical records that give some credence to Goelling's complaints, and Dr. Sarver's determination that Goelling's memory function falls within the mentally retarded range, the court finds that the evidence meets the materiality requirement under Wilkins, 953 F.2d at 96.

By making this finding, the court does not suggest that these records conclusively establish disability. Indeed, this evidence ultimately may not have any bearing on the ALJ's RFC assessment or the Commissioner's disability determination. "The duty to resolve conflicts in the evidence rests with the ALJ, not with the reviewing court." Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) (citing Kasey v. Sullivan, 3 F.3d 75, 79 (4th Cir. 1993)). Rather, the court is charged with reviewing "the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings." Wilkins, 953 F.2d at 96. Given this record, the court cannot answer that question in the affirmative. Accordingly, this

---

of 51-60 indicates than an individual has "[m]oderate symptoms . . . OR moderate difficulty in social, occupational or school functioning . . ." Id. at 34.

14

case is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration.

V

Additionally, this case should be remanded because the VE testimony on which the ALJ relied is inconsistent and incapable of producing a reliable assessment of Goelling's relevant work opportunities. The purpose of taking evidence from a VE at the administrative hearing is to determine whether there is work available in the national economy that a claimant can perform. In order for this testimony to be helpful, it must be based on consideration of all other evidence in the record and must be in response to proper hypothetical questions, which fairly set out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989).

In this case, the hypothetical provided to the VE at the administrative hearing contemplated a sedentary RFC with additional limitations that included:

> no more than simple, repetitive tasks; would not require complex or detailed instructions to him; he could sit six hours of eight; and stand two of eight; and I'm going to give him a sit/stand option at will; the job would not require driving as a duty; there would be no climbing of ladders, ropes, or scaffolds; all other postural requirements would be occasional; he could have occasional contact with co-workers, supervisors, and the public, but that contact would not be essential to his job, but only incidental; he would, basically, be able to work alone, but not in isolation; and there would be only occasional work setting and routine changes, he would have a fairly static type job with not a, not a lot of changes.

(R. 399-400.) In response to this hypothetical, the VE identified three jobs that Goelling could perform: patcher, toy stuffer, and bench hand. (R. 400.) The VE further testified his findings were consistent with the Dictionary of Occupational Titles ("DOT"), except that the DOT does not specify whether there is a sit/stand option and whether driving is involved. (R. 400.)

15

However, based on job site analysis, the VE testified that these jobs would not require driving and would provide for a sit/stand option. (R. 400-01.) The VE further stated:

> [T]he GED levels on these jobs are consistent with the number 2 and number 1. Under number 2 reasoning, there's a requirement for an individual to carry out detailed, but uninvolved verbal or written instructions. These jobs based on job site analysis, again, Your Honor, are a [sic] simple one, two step jobs.

(R. 401.)[9] His testimony concerning the need to carry out detailed instructions becomes less clear, however, following an examination by Goelling's attorney:

> Q. I think you said in these jobs there's something about detailed, did I understand that?
>
> A. That's correct.
>
> ALJ: Instructions I said.
>
> ATTY: Okay.
>
> BY ATTORNEY:
> Q. And that means he'd have to remember is that what we're saying?
>
> A. There is a need to recall, yes, in any form of work.
>
> Q. Okay. Would – so he would have to be able to have a pretty good memory to remember the detailed instructions is that what we're saying?
>
> ALJ: I said no detailed instructions.
>
> BY ATTORNEY:
> Q. Oh. I thought that you were saying that there was detailed instructions on those. Am I – did I understand you correctly?

---

[9] Appendix C to the Dictionary of Occupational Titles discusses the General Educational Development, or GED, levels and explains that the GED scale is composed of three divisions: reasoning development, mathematical development, and language development. The level 2 reasoning development requires application of commonsense understanding to carry out detailed but uninvolved written or oral instructions. See http://www.occupationalinfo.org/appendxc_1.html.

> A. The way the jobs are classified the GED level is a number 2 which is a requirement for detailed activities; however, based on job site analysis these are simple one, two step jobs and do not require detail –
>
> Q. Okay.
>
> A. – activity.
>
> ALJ: I'd like to make the clarification; I said instructions not activities and the activities themselves are impaired [sic] to tasks.
>
> VE: I'm sorry, Your Honor. It is instructions not activities.
>
> ALJ: Okay. So detailed instructions?
>
> VE: That is correct.
>
> ALJ: Okay.
>
> VE: That is the definition of –
>
> . . .
>
> VE: -- reasoning.

(R. 401-02.) Notwithstanding the confusion of the words "instructions" and "activities," the VE testified that the jobs he identified are simple one, two step jobs that do not require detailed instructions, despite the DOT's classification of GED level 2. The VE then contradicts himself, however, suggesting even these jobs involve some level of detailed instructions:

> ALJ: And even –
>
> . . .
>
> ALJ: -- simple repetitive tasks have some degree of [detailed instructions] you're saying?
>
> VE: Yes.

(R. 402.) Thus, the VE is unclear about whether a patcher, toy stuffer and bench hand must carry out detailed instructions, which, according to the hypothetical provided by the ALJ, Goelling

17

cannot do. The ALJ then appears to have changed the hypothetical to preclude extensive detailed work, as opposed to detailed instructions:

> ALJ: Okay. All right. And just to be clear with what I'm saying, I'm not, I'm not saying that he can't handle the minor details, okay, in my, in my – everybody does some detailed work. What I'm looking at is, is a job that's going to require him to do fairly extensive detailed work. Okay? That's what I'm precluding to make sure we're clear on that. And with respect to that clarification does that affect your numbers in any way?
>
> VE: It does not, Your Honor.
>
> ALJ: Okay. Then let's just say extensive detailed work just to be clear. Okay? I would even put in there, just so we don't have any confusion in there, I would say that no sustained concentration longer than 15 minutes on a single task or project, sustained concentration on a single task. How would that affect your numbers?
>
> VE: There is no effect.

(R. 401-03.) Yet in his decision, the ALJ includes a limitation on complex instructions in his RFC determination. (R. 82.) Based on the VE testimony, the ALJ held that Goelling can perform jobs that exist in significant numbers in the national economy, including patcher, bench hand and toy stuffer. (R. 83.)

On this record, the court simply cannot say that the ALJ's decision is supported by substantial evidence. The VE is all over the board on this issue, and his testimony is incapable of producing a reliable assessment as to Goelling's work opportunities. As such, this case is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further vocational assessment.

## VI

Considering the evidence in the administrative record as a whole, the court finds that the Commissioner's decision is not supported by substantial evidence and this case must be

remanded. The ALJ did not have the benefit of objective medical evidence supporting Goelling's allegations of a traumatic brain injury when assessing Goelling's credibility and determining his RFC. It may well be at the end of the day that the Commissioner again concludes that Goelling has not met his burden of proving he is disabled from all work. However, the court is constrained to find based on the record before it that objective evidence of a brain injury might have made a difference in the ALJ's disability determination. Additionally, the ALJ relied on testimony from the VE that is inconsistent and incapable of producing a reliable assessment of Goelling's work opportunities at step 5 of the sequential evaluation process.

For these reasons, the undersigned **REVERSES** and **REMANDS** this case to the Commissioner for further consideration. Accordingly, defendant's motion for summary judgment (Dkt. #19) is **DENIED**.

The Clerk of Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

    Entered: August 30, 2010.

    /s/ Michael F. Urbanski

    Michael F. Urbanski
    United States Magistrate Judge